JOURNAL ENTRY AND OPINION
This is an appeal from an order of Judge Eileen A. Gallagher that suppressed evidence in a prosecution for two counts of aggravated vehicular assault[1] and one count of driving while under the influence ("DUI").[2] The appellant State claims that appropriate procedures were utilized in obtaining, storing, and testing blood and urine samples used to determine the alcohol level of the appellee, Michael E. Gordon. It contends that it substantially complied with the Ohio Department of Health regulations when it tested his blood "serum" instead of his whole blood, and when his urine sample was taken while a police officer was not present to witness its collection. We affirm suppression of the blood sample test but reverse with respect to the urine sample.
On July 12, 2000, then twenty-nine-year-old Gordon was involved in a car accident in Garfield Heights in which he and two other persons were injured. Suspected of driving while intoxicated, he consented to the taking of blood and urine samples after being taken to Marymount Hospital for treatment. Hospital employees oversaw collection of the samples and gave them to a police officer who delivered them to the Cuyahoga County Coroner's Office for testing. The only gap in the chain of custody was an admission by Garfield Heights police officer David Dupont that he did not personally observe the collection of Gordon's urine sample, but stood outside a curtain while Gordon provided it.
At the hearing on Gordon's motion to suppress evidence, the State established that the blood and urine samples were collected on July 12th at 8:52 p.m. and 8:59 p.m., respectively, and that Officer Dupont delivered them to the coroner's office at 10:17 p.m. that evening where they were refrigerated until being tested on July 14, 2000. Dr. Amanda Jenkins, chief toxicologist at the coroner's office laboratory, who tested the blood and urine samples, testified that each contained ethyl alcohol in excess of the limit for operating a motor vehicle. She admitted, however, that a solid anticoagulant had not been added to the blood sample as prescribed in the Ohio Administrative Code, and her blood test analyzed the "serum" alcohol content instead of the "whole blood" alcohol content.
The judge granted the motion to suppress, finding that the officer was required to physically observe the collection of the urine sample, and that the blood sample was inadmissible because the lack of an anticoagulant in the blood sample violated Ohio Administrative Code regulations. The State asserts a single assignment of error:
 THE TRIAL COURT ERRED IN ITS GRANTING OF THE DEFENDANT'S MOTION TO SUPPRESS.
Gordon's challenge was appropriately raised as a motion to suppress, and the State's appeal is cognizable under Crim.R. 12(K).[3]
When reviewing an order on a motion to suppress evidence, we defer to the judge's findings of historical fact, but assess the application of law to those facts de novo.[4] The relevant facts are not disputed — the State admits that the blood sample did not contain a solid anticoagulant, and that the officer did not personally observe Gordon while he was urinating.
When raised in a motion to suppress, the State bears the burden of showing that it complied with procedures for collecting and testing blood and urine samples.[5] To be admissible, the collection and testing of the specimens must "substantially comply" with Administrative Code regulations.[6] We will assess each sample separately.
The Blood Sample
In State v. Perry[7] the Court of Appeals for Summit County found that the lack of anticoagulant in a blood sample did not render test results inadmissible. We agree, at least to the extent that the lack of an anticoagulant does not per se render the test results inadmissible.
Perry's reasoning was based on the language of R.C. 4511.19
and Ohio Adm. Code 3701-53-01, both of which refer to tests of "blood, urine, breath or other bodily substance[s]."[8] The language referring to "other bodily substances" has been interpreted to allow the testing of either whole blood or blood serum in substantial compliance with the regulations. Moreover, Ohio Adm. Code 3701-53-05(C) states that blood shall be drawn "into a vacuum container with a solid anticoagulant or according to the laboratory protocol as written in the laboratory procedure manual * * *." (Emphasis added.) Therefore, it appears that serum levels can be tested so long as the director of health approves the method,[9] and the method is shown to be scientifically sound. However, for the test of some "other bodily substance" to have relevance, the result must be converted to one of the concentrations stated in R.C. 4511.19.
R.C. 4511.19 states definite alcohol concentration limits for whole blood, urine, and breath.[10] Dr. Jenkins testified that blood serum concentrations are higher than those for whole blood, and the serum test result would have to be converted to that of whole blood. She further testified that testing blood serum instead of whole blood "would affect the conversion to the blood alcohol, because of the variability in the converting serum to the blood." [sic]
Al though we are not certain of the meaning of this statement or whether it was accurately transcribed, it does suggest that if serum testing is to be undertaken, the approved laboratory procedure should include an approved, scientifically accepted method for converting the serum level to that of whole blood. If this cannot be done in a satisfactory manner in compliance with Ohio Adm. Code 3701-53-03 (method must have "documented sensitivity, specificity, accuracy, precision and linearity"), then serum tests cannot be accepted.
The results in this case are inadmissible because Dr. Jenkins did not testify that she converted the serum alcohol content to a whole blood concentration, nor did she testify to any laboratory procedures for testing blood serum content and converting the results to that of whole blood. In fact, Dr. Jenkins testified that although the coroner's office routinely performs tests on blood serum, she does not "regularly" convert those results to whole blood concentrations. Moreover, she expressed a belief that the relevant "laboratory protocol" stated in Ohio Adm. Code 3701-53-05(C) was that of the collecting entity and not the testing laboratory.
The State had the burden of proving that the lack of a solid anticoagulant was excused because the testing was done according to an alternative laboratory protocol stated in a written laboratory procedure manual, but failed to do so; indeed, Dr. Jenkins' mistaken belief indicates that no such protocol existed.
Ohio Adm. Code 3701-53-01(B) states that a copy of the laboratory procedure manual required by Ohio Adm. Code 3701-53-06(D) "shall be on file in the area where the analytical tests are performed." Section 3701-53-05(D) specifies that urine is to be collected "as set forth in the procedure manual of the laboratory that will be performing the analysis" in accordance with section 3701-53-06(D). Sections3701-53-06(C) and (D) refer to the written procedure manual required for each testing laboratory, which shall contain "all analytical techniques or methods used by the laboratory" for testing, and which shall be reviewed, signed, and dated by the laboratory director. Finally, R.C.3701.143, under which authority the regulations are promulgated, empowers the director of health to determine and approve "techniques or methods for chemically analyzing a person's blood, urine, breath, or other bodily substance * * *."
These provisions show that the term "laboratory" referred to in Ohio Adm. Code Chapter 3701-53 is the testing laboratory, and the written procedure manual at issue is that presumably on file at the coroner's office. It makes no difference whether a hospital collects a blood sample without an anticoagulant — the question is whether the coroner's office has approved procedures in place to test such a sample. The State has presented no evidence that the blood sample was collected and tested in compliance with approved procedures designed to yield a result that can be expressed as a whole blood concentration. Moreover, it made no effort to convert the serum result to a whole blood concentration, but simply asserted the serum level as equivalent to the whole blood level, which, as Dr. Jenkins testified, is not the case.[11]
The judge correctly suppressed evidence of the blood test results, and we overrule this portion of the State's assignment of error.
The Urine Sample
Ohio Adm. Code 3701-53-05(D) states that "collection of a urine specimen must be witnessed to assure that the sample can be authenticated" and, because the judge found the police officer did not comply with that regulation, she suppressed the evidence of the urine test. We disagree. The police officer testified that he personally observed the nurse draw Gordon's blood, and stood outside a curtain as he provided his urine sample a few minutes later. Substantial compliance with the regulation does not require the officer to watch the suspect while he urinates, as long as the sample is otherwise collected under circumstances that do not raise suspicions about the sample's authenticity. It is necessary only to show that it is "reasonably certain that substitutions, alteration or tampering did not occur."[12]
The evidence shows that the police officer was on the scene, but afforded Gordon the privacy of urinating behind a curtain. Nothing in the evidence suggests that Gordon had an opportunity to substitute or tamper with his sample before it was delivered to the officer who sufficiently witnessed the collection procedure and safeguarded the authenticity of the sample. We find substantial compliance with Ohio Adm. Code 3701-53-05(D) and sustain this portion of the assignment of error.
Judgment affirmed in part and reversed in part.
It is ordered that each party bear its own costs herein taxed.
This court finds there were reasonable grounds for this appeal.
It is ordered that a special mandate issue out of this court directing the Cuyahoga County Common Pleas Court to carry this judgment into execution.
A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.
ANN DYKE, J., and COLLEEN CONWAY COONEY, J., CONCUR.
[1] R.C. 2903.08.
[2] R.C. 4511.19.
[3] Defiance v. Kretz (1991), 60 Ohio St.3d 1, 573 N.E.2d 32, syllabus.
[4] State v. Siegel (2000), 138 Ohio App.3d 562, 566, 741 N.E.2d 938,940-41.
[5] State v. French (1995), 72 Ohio St.3d 446, 451-452,650 N.E.2d 887, 892.
[6] Kretz, 60 Ohio St.3d at 3, 573 N.E.2d at 34.
[7] (1996), 108 Ohio App.3d 709, 671 N.E.2d 623.
[8] Id. at 712-713, 671 N.E.2d at 625-626; R.C. 4511.19(D)(1); Ohio Adm. Code 3701-53-01(A).
[9] R.C. 3701.143.
[10] R.C. 4511.19(A)(2), (3), and (4).
[11] Therefore, even if the State had shown substantial compliance with regulations, Gordon established prejudice because Jenkins testified that the serum level is higher than that for whole blood, and she did not testify to the converted figure. State v. Plummer (1986),22 Ohio St.3d 292, 22 OBR 461, 490 N.E.2d 902, syllabus.
[12] State v. Mays (1995), 108 Ohio App.3d 598, 618, 671 N.E.2d 553,565. (Citations omitted.)